

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00099-CV

———————————————————

IN THE INTEREST OF K.A., A CHILD

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-569007-15

Before Sudderth, C.J.; Gabriel and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

This is an accelerated appeal in which Mother[1] appeals the termination of her parental rights to K.A.[2] In four issues, Mother argues that the trial court entered "conflicting" best-interest findings in its termination order and in its findings of fact, that the findings of fact control, and thus the trial court failed to make a best-interest finding; that the foster parents in this case lacked standing to intervene; and that there is insufficient evidence to support the trial court's finding under Texas Family Code Sections 161.001(b)(1)(F) and 161.001(b)(1)(O). We will affirm.

### II. BACKGROUND

Because the Department of Family and Protective Services (Department) had received allegations that Mother had engaged in behavior that endangered K.A.'s well-being, the Department initiated an investigation that ultimately led the Department to seek termination of Mother's and Father's parental rights to K.A. The Department's involvement began on August 9, 2017, when K.A. was two years old. K.A. was placed at five different homes, sometimes more than once, with various relatives and one foster couple over a nineteen-month span before the trial court held a final

[1]Father has not appealed the trial court's order terminating his parental rights to K.A.

[2]In order to protect the identity of the minor child in this case, we use aliases or initials in the place of proper names when referring to the child, the parties, and the witnesses. *See* Tex. R. App. P. 9.8 cmt., 9.10; Tex. App. (Fort Worth) Loc. R. 7.

termination hearing on March 11, 2019. In addition to attorneys for the Department, the hearing also involved Mother's attorney, Father's attorney, K.A.'s attorney ad litem, and attorneys for the foster parents who intervened in this case.

At the hearing, Dominique Veal, a former investigator for the Department testified. Veal said that while she worked for the Department, on August 9, 2017, she investigated allegations that Mother was using methamphetamine on a daily basis, that K.A. was underweight, and that K.A. had ingested a methamphetamine byproduct while at home. After running a background on the family, Veal attempted to make contact with Mother that evening by going to the home but was unable to make contact. Veal said that she finally made contact with Mother the next day via telephone and then made a home visit on August 11, 2017, where she met Mother, Grandmother, and K.A. According to Veal, Mother denied the allegations.

Veal stated that she conducted an oral swab on Mother and that the results came back positive for methamphetamine and amphetamines. Veal said that Mother denied having used methamphetamine but did offer the explanation that her boyfriend, whom Mother allegedly had an active emergency protective order against at the time, had given her a white powder contained in a capsule to help her with her bulimia. Veal testified that she discussed Mother's drug use history with Mother and she learned that Mother had previous addictions to Xanax, which resulted in an older daughter being placed with her father, and to Vicodin, which Mother told Veal she stopped using when K.A. turned six months old.

Veal said that the Department enacted a safety plan that day and that K.A. was temporarily placed with the foster parents with whom he now lives. As part of the plan, Mother was not to have any unsupervised contact with K.A. Initially, the plan specified that K.A. would be supervised by either Grandmother or a neighbor, but later, Veal interviewed Great-Grandmother and made her an alternative placement for K.A. under the plan. That same day, August 18, 2017, Mother submitted to a follicle hair test and again tested positive for methamphetamine and amphetamines. Veal said that these results concerned her because it meant that Mother was actively using methamphetamine. By Veal's account, at some point during the investigation K.A. also tested positive for methamphetamine. Because of these results and because Veal had learned that Mother was still living with Grandmother and sometimes watching K.A. unsupervised, Veal said that the Department implemented a second parental child safety placement which involved ultimately placing K.A. at Great-Grandmother's house.

Veal met Mother at her home as the second safety placement was being implemented and requested another oral swab from Mother, which Mother refused. Veal returned the next day and obtained an oral swab from Mother—she tested positive again for methamphetamine and amphetamines. Mother then acknowledged that she had used methamphetamine recently. Mother also became confrontational when Veal asked where Mother had been staying the last few days, to which Mother "sarcastically said that she was staying under a bridge." And because Mother had also

4

made a comment about "blow[ing] her head off" during this interaction, Veal said that the Department got the police involved out of worry for Mother's safety.

Veal testified that difficulty arose while K.A. was placed with Great-Grandmother. Specifically, Veal stated that Mother and Grandmother had threatened to take K.A. from Great-Grandmother and then later Mother and an ex-boyfriend—who was reportedly "a hit man" and the boyfriend that Mother had previously obtained an emergency protective order against—threatened to shoot Great-Grandmother. The experience caused Great-Grandmother to move in with a friend for a while because she was scared.

According to Veal, because of an upcoming surgery that Great-Grandmother had scheduled prior to K.A. being placed with her, the Department was faced with an urgent need to place K.A. with someone else. Veal said that Mother was not an option because placing K.A. with Mother risked his physical health, safety, and well-being. Because the Department was unable to locate a suitable placement for K.A. after Great-Grandmother was no longer an option, the Department sought removal of K.A. In the second half of 2018, K.A. was placed back with his foster parents.

Veal also averred that her research into Mother's criminal history revealed that Mother had multiple convictions for assault, a conviction for driving while intoxicated, and a conviction for possession of a controlled substance.

Gracie Gurrola, a conservatorship specialist with the Department, testified that she received this case in February 2018. Gurrola said that after reviewing the case file,

5

what concerned her the most were Mother's history of drug use and unaddressed mental health issues. According to Gurrola, she grew more concerned about Mother as the case remained pending because during that time Mother was arrested for domestic violence against Grandmother and then she was later arrested for possession of drug paraphernalia. Gurrola also said that Mother had tested positive for drugs during that same time and that she often acted erratic. In all, from initial investigation until trial, Mother tested positive at least six times for methamphetamine and refused to submit a sample on multiple occasions. By Gurrola's account, after refusing to submit a sample, Mother declared that "she was not going to comply with the Department anymore."

Gurrola said that Mother attended most of her scheduled visits with K.A. while he was placed with others, but Gurrola also said that Mother would become irritable and uninterested if a visit lasted longer than an hour. Gurrola recalled how on one occasion Mother had shouted at K.A. that she "couldn't stand to be around him for long periods of time." By Gurrola's account, Mother's shouting and erratic behavior caused K.A. to run to his room and huddle "into a small ball in the corner." Gurrola said that it took a couple of minutes to calm him down. She also said that Mother had once threatened suicide in front of K.A. and that it was not uncommon for Mother and Grandmother to argue and yell in front of him.

Regarding Mother's housing situation, Gurrola said that Mother was living with a friend named Moe, but Gurrola was never able to verify Mother's housing

accommodations because Mother rescheduled visits to the home multiple times. Gurrola further said that she was concerned because Mother had conveyed to Gurrola that Mother had to exchange sexual favors with Moe in order to remain living with him. Gurrola averred that even though Mother claimed to be employed off and on, Mother never verified any employment with Gurrola, and Mother never demonstrated an ability to provide K.A. with a safe and stable living environment. Gurrola also stated that she did not believe that K.A. should be returned to Mother because she had endangered K.A.'s well-being and had also left him with people in an environment that endangered K.A.'s physical and emotional well-being.

Gurrola averred that Mother had not completed the majority of her service plan. Under the service plan, Mother was to have a psychosocial assessment and engage in individual counseling. She also needed to demonstrate financial stability and stable housing. Mother was further required to complete a drug assessment and submit to random drug testing.

Gurrola said that although Mother had initially gone to and been discharged from outpatient treatment for drug use, the program she was in did not consider her a successful discharge because although she attended the requisite number of sessions, "she had not engaged" in the sessions. Gurrola did say that Mother had begun attending another drug-use treatment program beginning in January 2019 and that she had also been seeing an individual therapist since January as well, but Gurrola said that Mother had not successfully completed individual counseling and drug treatment

7

according to her service plan despite being given ample time. On February 15, 2019, Mother refused to submit to a drug test, which Gurrola said that the Department considered a failed drug test. Gurrola further said that despite being prescribed medication for depression, Mother stopped taking the medication alleging that she did not like the side effects.

Gurrola discussed two possible placements for K.A. that the Department believed were better suited for K.A. than being returned to Mother's care. Gurrola explained that the Department's first choice of placement for K.A. would be with his maternal Uncle and Wife because Uncle and K.A. are related and the Department's policy is that family members are the preferred final placement for children. Gurrola averred that the Department already had an approved home study for Uncle and Wife's home but that Uncle and Wife would need to be named permanent managing conservators. Gurrola stated that under the scenario where Uncle and Wife were named permanent managing conservators of K.A. and he was placed with them, the Department preferred that Mother's rights to K.A. not be terminated, but she admitted that under this plan there was potential instability for K.A. because Mother, or someone else, might ultimately attempt to gain permanent managing conservatorship over K.A. in the future. Gurrola also testified that regardless of K.A.'s ultimate placement, termination of Mother's parental rights was in K.A.'s best interest.

Gurrola also admitted that Uncle and Wife had given numerous inconsistent answers to Department investigators about past drug use, other family members with addiction issues, prior criminal histories, the ultimate results of Wife's prior involvement with the Department, and previous domestic violence in their home—Gurrola said she did not record these inconsistencies in her report. She further said that Uncle and Wife had still not made certain repairs or adjustments to their home four months after the Department asked them to do so. Gurrola agreed that it was also problematic that Uncle and Wife had reported a monthly gross income in excess of what they would have to report to receive food stamps but that Uncle and Wife had also listed receiving food stamps in their home study report. And even though Gurrola had told Uncle and Wife that they could visit K.A. while he was in foster care, Gurrola could only recall them having visited K.A. once. Neither Uncle nor Wife testified at the trial.

Gurrola testified that the Department's second choice of placement was with the foster parents that were caring for K.A. at the time of trial. Gurrola stated that under this scenario, the Department was seeking termination of Mother's parental rights and requesting the Department be named permanent managing conservator so that the foster parents could adopt K.A. with the Department's assistance.

Gurrola said that K.A.'s living with the foster parents was going "very well"; that they had provided K.A. with a safe, loving, and stable environment; and that the Department had no concerns regarding the safety of the foster parents' home. She

9

also said that the foster parents were able to meet K.A.'s physical, emotional, and financial needs now and in the future. Gurrola said that both foster parents were employed and that they had been paying for K.A. to go to daycare, which Gurrola said had been very beneficial for K.A. because it had helped him learn to socialize. By Gurrola's account, when the investigation began, K.A. had very limited speech, a poor appetite, and persistent constipation. He was also lethargic and a "stubborn [and] picky" eater. But now that he has lived with the foster parents for some time, according to Gurrola, K.A. has become very talkative, very energetic, and very creative. He also eats healthier. Gurrola averred that K.A. is "very bonded" with his foster parents.

Father testified that he was opposed to K.A. being placed in Uncle and Wife's home because he had learned from Mother that she and Wife smoked methamphetamine together. He averred that placing K.A. with Uncle and Wife would possibly be dangerous to K.A.'s well-being. Father further stated that he was in favor of his own parental rights being terminated and that it was in K.A.'s best interest that the foster parents be able to adopt K.A. Father also said that he was currently unstable.

Foster Father testified that K.A. currently lives with him and his wife and that this was the second time K.A. had been placed with them during the pendency of this case—the first time lasted three months until K.A. was moved to his Great-Grandmother's and the second time began several months before trial. Foster Father

10

said that he had been running a manufacturing facility for the past five years and that Foster Mother was a teacher and a soccer coach. He stated that he and his wife were both licensed as foster parents and licensed to adopt. Foster Father said that he had no criminal, mental, or addiction history. Foster Father described that when K.A. first came to live with them, he grunted rather than used words, he was very quiet, and he was persistently constipated. Foster Father said that when K.A. returned the second time, "He had gone backwards [in his behavior], to say the least."

Foster Father said that after K.A. left their home the first time, he reached out to Great-Grandmother and maintained bimonthly visits with K.A. because he "missed him." These visits often entailed K.A. staying the night with the foster parents. Foster Father said that Great-Grandmother had commented on how bonded he and K.A. were and how K.A. missed his foster parents often after being removed from their care the first time.

While on the stand, Foster Father read portions of texts between himself and Great-Grandmother wherein Great-Grandmother said that when K.A. stayed with her, he would cry and "always ask[ed] for Daddy" referring to Foster Father. In other texts, Great-Grandmother said that she was "[f]orever grateful" that K.A. had been placed with the foster parents and that she could see that K.A. "has a bond with [them]." Foster Father said that Great-Grandmother had also conveyed to him that she preferred K.A. be placed with the foster parents over Uncle and Wife. Foster Father testified that he was asking the court to terminate both Father's and Mother's

11

parental rights to K.A. because he believed that they both engaged in conduct that had endangered K.A. He also testified that he believed termination of their rights was in K.A.'s best interest. When asked what his plan was if the trial court did terminate the parental rights, Foster Father said, "We'd be very, very grateful for adoption." And Foster Father said that rather than naming the Department permanent managing conservator, he was asking the trial court to appoint him and his wife as such.

Foster Father stated that since being placed with them, K.A. has thrived at school and that he is bonded to the family dog, which he feeds every morning. According to Foster Father, he, his wife, and K.A. attend church regularly, and K.A. is enrolled in soccer. He also stated that the reason he and his wife began to foster children was for the ultimate purpose of adopting a child because they were unable to bear children and because he wanted to give a child the opportunity to have a better life.

After all parties closed, the trial court announced that it found that termination of the parent-child relationship between Mother and K.A. was in the best interest of K.A. The trial court also announced that it found that the evidence had established the statutory grounds for termination under Sections 161.001(b)(1)(D), 161.001(b)(1)(E), 161.001(b)(1)(F), 161.001(b)(1)(O), and 161.001(b)(1)(P). In its Order of Termination, the trial court made these same findings.

Later, Mother requested findings of fact and conclusions of law. In its Findings of Fact and Conclusions of Law, after finding that the trial court had

12

jurisdiction over this case, the trial court made explicit findings that track the language of Sections 161.001(b)(1)(D), 161.001(b)(1)(E), 161.001(b)(1)(F), 161.001(b)(1)(O), and 161.001(b)(1)(P). The trial court did not, however, make an explicit finding regarding K.A.'s best interest.

Mother filed a Motion for New Trial and Motion to Reform Judgment. Although this motion is not part of the record, the record does contain the trial court's order denying the motion for new trial. In its order, the trial court stated that it had made an implicit finding in its earlier findings of fact that termination of Mother's rights was in K.A.'s best interest. This appeal followed.

## III. DISCUSSION

### A. The Trial Court's Best-Interest Finding

In part of her first issue, Mother argues that the trial court's order terminating her parental rights to K.A. should be reversed because even though the trial court made an explicit best-interest finding in its Order of Termination, it did not make such a finding in its Findings of Fact and Conclusions of Law. Thus, Mother argues, there is a conflict between the best-interest finding in the termination order and the findings of fact. Mother further argues that the findings of fact trump any findings made in the order; therefore, the trial court effectively did not make a best-interest finding in this case. We disagree.

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground

13

listed in Section 161.001(b)(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established—termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

Generally, under Texas Rule of Civil Procedure 299a, findings of fact should not be recited in a judgment but should be filed as a separate document. *See* Tex. R. Civ. P. 299a. Under this rule, if findings are made in the judgment and they conflict with findings filed separately under Texas Rules of Civil Procedure, then the latter findings control for appellate purposes. *See id.* While Mother argues that this general rule applies in this case, it does not.

Mother "appears to confuse the general rule in civil cases that findings should not be made in the judgment with the requirement that the findings in section 161.001 of the Texas Family Code be made in a parental-rights-termination order." *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 194 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Mother also ignores the edict of Texas Rule of Civil Procedure 306 which explicitly states that "[i]n a suit for termination of the parent-child relationship . . . the judgment must state the specific grounds for termination . . . ." Tex. R. Civ. P. 306.

14

Here, the trial court was required by statute to make its findings regarding Section 161.001 in its termination order. That is precisely what the trial court did. In its order, in addition to finding that several of the statutory grounds for termination under Section 161.001(b)(1) had been established, the trial court found that termination of Mother's parental rights to K.A. was in K.A.'s best interest under Section 161.001(b)(2). *See* Tex. Fam. Code Ann. § 161.001(b).

But even if the general rule that findings of fact trump findings made in a judgment applied in this case, we agree with the trial court's explanation in its order denying Mother's motion for new trial that the best-interest finding was implicit in its Findings of Fact and Conclusions of Law. Without citing any authority to support her position, Mother argues that the best-interest finding is an "independent claim" from findings of violations listed in Section 161.001(b)(1). We disagree.

A best-interest finding is not a unique claim; rather, it is an element required for termination. *See In re J.F.C.*, 96 S.W.3d 256, 262 (Tex. 2002); *see also Wiley v. Spratlan*, 543 S.W.2d 349, 351 (Tex. 1976) ("Both *elements* must be established and the requirements of Subdivision (1) are not excused because a court may be of the opinion that Subdivision (2) has been proved.") (emphasis added). Indeed, in *J.F.C.*, the Supreme Court of Texas held that the omission of a best-interest instruction in the jury charge was error because "the charge . . . omitted *a statutorily prescribed element for parental termination.*" *J.F.C.*, 96 S.W.3d at 262. (emphasis added). Further, Rule 299 of the Texas Rules of Civil Procedure provides that "[w]hen findings of fact are filed

15

by the trial court . . . [and] one or more elements [of a claim] have been found by the trial court, omitted unrequested elements, when supported by evidence, will be supplied by presumption in support of the judgment." Tex. R. Civ. P. 299.

Mother candidly admits, and our review of the record reveals, that the trial court's findings of fact contain express findings as to Mother's five separate violations of subsection 161.001(b)(1). Because a best-interest finding is a prescribed element for parental termination, the best-interest element is presumed in each of the express findings made in the trial court's Findings of Fact and Conclusions of Law. *J.F.C.*, 96 S.W.3d at 262. We overrule this portion of Mother's first issue.

In the remainder of Mother's first issue, Mother appears to be challenging the sufficiency of the evidence to support the best-interest finding. In her brief, although the lion's share of her argument on this first issue is dedicated to the "conflicting findings" argument addressed above, Mother does complain multiple times about the lack of any indication that the trial court applied the *Holley* factors in making its best-interest finding. Mother also argues that "the record does not contain even a scintilla of evidence that the trial court considered the two alternatives presented by the Department." Mother does not cite any authority for the proposition that a trial court errs by not following the Department's recommendations when finding that the parent-child relationship should be terminated. We interpret these arguments, as the

16

Department[3] did in its brief, as a challenge to the sufficiency of the evidence to support the best-interest finding.

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

In evaluating the evidence for factual sufficiency in parental termination cases, we are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and

---

[3]The Department is represented by the Tarrant County District Attorney's office in this appeal.

do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28.

Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include the following: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or

18

proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* That is, "[a] lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

With regard to K.A.'s desires, due to his young age, he did not possess sufficient maturity to express an opinion regarding a parental preference. *See In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.). The trial court was entitled to find that this factor weighed neither in favor of nor against termination of Mother's parental rights to K.A.

As for the emotional and physical needs of K.A. now and in the future, his basic needs include food, shelter, and clothing; routine medical and dental care; a safe, stimulating, and nurturing home environment; and friendships and recreational activities appropriate to his age. *In re L.S.*, No. 02-16-00197-CV, 2016 WL 4699199,

at *6 (Tex. App.—Fort Worth Sept. 8, 2016, no pet.) (mem. op.). Here, multiple Department workers testified that Mother had not demonstrated an ability to provide a safe and stable home for K.A. The evidence also indicates that when in Mother's care, K.A. had eating issues, and he was persistently constipated. And the initial allegations that led the Department to investigate included that K.A. was underweight. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to K.A.

With regard to the emotional and physical danger to K.A. now and in the future, the record reveals that significant harm could be inflicted on K.A. by Mother due to Mother's persistent drug use—K.A. once tested positive for methamphetamine. Moreover, Mother did not provide a nurturing environment for K.A. Indeed, Mother often acted erratic and would yell in front of or at K.A. In one instance, Mother yelled at K.A. that she could not stand to be around him for long periods of time. This statement is consistent with Gurrola's testimony that Mother had difficulty with visits that lasted longer than an hour. Mother even threatened to commit suicide in K.A.'s presence. In addition, there is evidence in the record that Mother dates men that are either violent or require sexual favors from Mother in exchange for a place to live. And Mother has not adequately addressed her mental health issues, and she purposely quit taking medication for depression. The trial court was entitled to find that this factor weighed heavily in favor of termination of Mother's parental rights to K.A.

Regarding the parental abilities of the individuals seeking custody, Gurrola testified that under the foster parents' supervision, K.A. has gone from being lethargic, a limited speaker, and a picky eater to being a very talkative, energetic, and creative boy who now eats healthier. Gurrola also said that the foster parents possessed the ability to meet K.A.'s physical, emotional, and financial needs now and in the future. She also averred that the foster parents have K.A. enrolled in daycare where he has learned to socialize better. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to K.A.

As to Mother's parenting abilities, Mother did not testify at trial regarding her parenting abilities, but there is significant evidence in the record that she struggles being a parent to K.A. As mentioned, Mother has an inability to be around K.A. for more than an hour. She often acts erratic and yells at or in front of him. Mother continued to use methamphetamine throughout the pendency of this case despite the fact that she could lose her rights to K.A. And there is evidence that Mother's lack of parenting ability led to K.A. consuming a methamphetamine biproduct. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to K.A.

Regarding programs available to assist Mother, the record reveals that although Mother completed one course of outpatient drug rehabilitation, the provider of the rehabilitation did not consider Mother a successful discharge because she was not engaged while there. The record also demonstrates that Mother did not complete the

21

majority of her court-ordered services. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to K.A.

With regard to the plans for the child and the stability of the proposed placement, Mother did not put on any evidence of her plans for K.A. In fact, Mother did not testify or call any witnesses. And to the extent that this factor should consider the Department's first suggested placement of K.A. with Uncle and Wife, there is ample evidence in the record that Uncle and Wife had been dishonest when being investigated by the Department as a possible placement for K.A.; that they had failed to make the recommended repairs and changes to their home as requested by the Department; that Uncle was dishonest about the outcome of his criminal conviction; that Wife was dishonest about the outcome of her prior involvement with the Department; and Uncle and Wife are not eligible to adopt K.A., leaving him subject to possibly being removed from Uncle and Wife's home in the future if Mother, or anyone else, decides to contest K.A.'s placement with Uncle and Wife, which would not be stable for K.A. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to K.A.

As to the plans for K.A. by the foster parents and the stability of their home, Gurrola said that the Department had no concerns about the stability of the foster parents' home and that the foster parents desired to adopt K.A., thereby giving him stability. Further, the Department would assist the foster parents in adopting K.A.

The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to K.A.

Considering Mother's acts or omissions that may indicate that the existing parent-child relationship is not a proper one, the analysis set forth above—which details Mother's drug use that continued through the pendency of this case, Mother's housing instability, Mother's erratic behavior, Mother's inability to be around K.A. for more than an hour, as well as Mother's failure to take advantage of the services that she was offered—reveals that the existing parent-child relationship between Mother and K.A. is not a proper parent-child relationship. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to K.A.

As for any excuse for Mother's acts or omissions, Mother did not testify at trial and thus gave no excuses for acts or omissions. But the trial court did hear evidence that Mother lied about having taken drugs and instead blamed a positive drug test on a pill she claimed she had taken for her bulimia. Mother presented no evidence at trial excusing why she repeatedly failed drug tests, would act erratically around K.A., or failed to follow her service plan. The trial court was entitled to find that this factor weighed in favor of termination of Mother's parental rights to K.A.

Viewing all the evidence in the light most favorable to the best-interest finding and considering the nonexclusive *Holley* factors, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Mother and K.A. was in K.A.'s best interest, and we

23

therefore hold the evidence legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally sufficient to support best-interest finding when most of the best-interest factors weighed in favor of termination); *see also In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *11–12 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.) (holding evidence legally sufficient to support best-interest finding based on mother's lack of a safe, stable home environment; noncompliance with services; and drug use).

Similarly, reviewing all of the evidence with appropriate deference to the factfinder, we hold that the trial court had sufficient evidence before it that was relevant to the *Holley* factors from which it could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Mother and K.A. was in K.A.'s best interest, and we therefore hold that the evidence is factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan*, 325 S.W.3d at 733 (holding evidence factually sufficient to support best-interest finding when most of the best-interest factors weighed in favor of termination); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with [a] family service plan support a finding that termination is in the best interest of the child."). We overrule the remainder of Mother's first issue.

**B.    The Foster Parents as Intervenors**

In her second issue, Mother argues that the foster parents in this case lacked standing to intervene and thus the trial court abused its discretion by overruling her motion to strike their intervention. The Department agrees that the trial court abused its discretion but argues that Mother has failed to show any harm from the intervention. We conclude that Mother has failed to meet her burden of providing a sufficient record to show that the trial court erred. Further, even assuming the trial court abused its discretion by allowing the foster parents to intervene, Mother has failed to claim or show any harm from their intervention.

In this case, there is no direct evidence that the trial court held a hearing regarding Mother's motion. The record before us contains no reporter's record of a hearing on Mother's motion nor does it contain an order by the trial court denying her motion. Without a record of the evidence presented to the trial court, we must presume that the evidence supports the ruling. *See Nicholson v. Fifth Third Bank*, 226 S.W.3d 581, 583 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that it is appellant's burden to request court reporter to make record of proceedings and bring forward sufficient record to show error committed by trial court); *In re M.M.F.*, No. 02–08–00014–CV, 2008 WL 5265033, at *13 (Tex. App.—Fort Worth Dec. 18, 2008, no pet.) (mem. op.) ("If appellant provides no record of the evidence presented to the trial court, we must presume that the evidence supports the ruling.").

25

Additionally, Mother has failed to show that she was harmed by the trial court's ruling. Even when a trial court abuses its discretion by failing to strike an intervenor, the party that appeals that erroneous decision must still demonstrate harm and show support for that harm from the record. *See Jabri v. Alsayyed*, 145 S.W.3d 660, 672 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (holding that because appellants cited "to no portion of the trial that they claim demonstrates harm nor do they otherwise give support for any alleged harm," the trial court's error in failing to strike intervenor was harmless); *McCord v. Watts*, 777 S.W.2d 809, 811 (Tex. App.—Austin 1989, no writ) (same).

Here, there is ample evidence demonstrating why Mother's parental rights to K.A. should have been terminated. Nothing in Foster Father's testimony would have impacted the outcome of the trial court's order to terminate Mother's parental rights. In fact, Mother argues in her brief that one of the options that the Department suggested, that her rights be terminated and the Department be named permanent managing conservator of K.A., would have been proper. The only outcome that is different because of the intervention is that instead of the Department being named permanent managing conservator, the foster parents were. But Department employees testified that if Mother's rights were terminated, that placement with the foster parents was preferred, that the Department would desire to be named permanent managing conservator, and that later the Department would assist in the foster parents' adopting K.A. The outcome of either of these post-termination

26

scenarios has no impact on Mother once the trial court ordered her rights terminated. *See Jabri*, 145 S.W.3d at 667.

Based on our review of the record, even assuming that the trial court erred by failing to strike the intervention, that ruling did not probably cause the rendition of an improper judgment or probably prevent appellants from properly presenting the case to the court of appeals. Therefore, the error provides no ground for reversal. *See* Tex. R. App. P. 44.1(a); *McCord*, 777 S.W.2d at 811 (holding that any error in failing to strike intervention was harmless). We overrule Mother's second issue.

## C. The trial court's findings under Sections 161.001(b)(1)(F) and 161.001(b)(1)(O)

In her third and fourth issues, Mother argues that the trial court erred by finding that she had violated Sections 161.001(b)(1)(F) and 161.001(b)(1)(O) of the Family Code. The Department counters that because Mother does not challenge the other three statutory grounds for termination in the court's termination order, any potential error in the court's findings of Sections 161.001(b)(1)(F) and 161.001(b)(1)(O) is harmless. *In re K.C.*, 23 S.W.3d 604, 608 (Tex. App.—Beaumont 2000, no pet.); *see also Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 64 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("When, as here, an appellant does not challenge an independent ground that may, under the record presented, support the judgment that appellant seeks to reverse, this Court may not address either the

27

challenged grounds or the unchallenged ground and has no choice but to overrule the challenges that the appellant has chosen to assert."). We agree with the Department.

Here, Mother does not challenge the trial court's findings under Sections 161.001(b)(1)(D), 161.001(b)(1)(E), or 161.001(b)(1)(P). Because any of these three grounds alone could support the trial court's termination order, we need not "review legal and factual sufficiency arguments as to the other grounds." *In re J.F.G., III*, 500 S.W.3d 554, 560 (Tex. App.—Texarkana 2016, no pet.).[4] We overrule Mother's third and fourth issues.

## IV. CONCLUSION

Having overruled all four of Mother's issues on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: September 12, 2019

---

[4]We note that our decision to not address the sufficiency of the evidence to support the trial court's findings related to Sections 161.001(b)(1)(D) and 161.001(b)(1)(E) does not run afoul of the Supreme Court of Texas's recent decision in *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam). In this case, Mother does not challenge these findings, and the court in *N.G.* made it clear that its holding that a reviewing court must review Sections 161.001(b)(1)(D) and 161.001(b)(1)(E) even when another statutory ground sufficiently supports termination is predicated on the party's having challenged Sections 161.001(b)(1)(D) and 161.001(b)(1)(E) on appeal. *Id.*